## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Ruari. C., by and through his Parents, | : | |
| Ronan C. and Beth C. | : | |
| of Yardley, Pennsylvania | : | Civil Action |
| Plaintiffs | : | |
| v. | : | No. |
| | : | |
| PENNSBURY SCHOOL DISTRICT | : | |
| 134 Yardley Avenue, | : | |
| Fallsington, Pennsylvania 19054 | : | |
| | : | |
| Defendant | : | |

## COMPLAINT

### I.  Introduction

1.      This action is brought by Ruari C., a minor child with disabilities, and his parents Ronan C. and Beth C. ("Plaintiffs" or the "Family"), against Defendant Pennsbury School District (the "School District" or "District") under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*; Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794; the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.*; the federal and state implementing-regulations of the foregoing statutes; and Chapters 14 and 15 of the Pennsylvania Code.

2.      Ruari is a young man with Attention Deficit Hyperactivity Disorder ("ADHD") whose parents were forced to place him at the Holy Ghost Preparatory School ("HGP") after the District failed for years to provide him with an appropriate education. Based on a flawed evaluation, the School District erroneously identified him as a student on the autism spectrum and offered him a placement in an Autistic Support Classroom.

3.      In contrast to the lack of appropriate programming offered by the District, the

programming at HGP provides Ruari with the small, structured, and supportive learning environment he requires. As a result, Ruari has flourished at HGP.

4.      After fully considering the entire record, this Court should determine that the District violated the foregoing statutes, reverse the Hearing Officer's decision, and award appropriate relief to the Family, specifically, tuition reimbursement for Ruari's 2021-22 school year at HGP and until such time as the District develops an appropriate program and placement for Ruari, reasonable attorneys' fees and costs, and any other relief this Court deems just.

## II.     **Parties**

5.      Ruari at all relevant times resided in Yardley, Pennsylvania with his Parents and within the geographical boundaries of the Defendant School District. Ruari is a student with disabilities as defined under IDEA with a disability classification of Other Health Impairment ("OHI") and Speech and Language Impairment ("SLI") and is a Protected Handicapped Student under Section 504 and the ADA.

6.      The District is located at 134 Yardley Avenue, Fallsington, Pennsylvania 19054. The District is the recipient of several sources of federal funds and is an educational agency designated by Pennsylvania law and the Pennsylvania Department of Education for the provision of educational services to individuals residing within its boundaries; such services include those mandated under IDEA as well as Pennsylvania's statutory/regulatory scheme concerning young children with disabilities.

## III.    **Procedural History**

7.      On February 28, 2021, the Family filed a Special Education Due Process complaint against the District for tuition reimbursement, an equitable remedy available under IDEA and

Section 504, for Ruari's fifth grade year (the 2020-21 school year).

8.      Following an evidentiary hearing held on May 20, 2022, and June 8, 2022, an administrative Hearing Officer issued a written decision on July 15, 2022, denying the Family relief.

9.      The Family now appeals to this Court and respectfully requests the Court reverse the Hearing Officer's decision and award appropriate relief to Ruari and the Family.

## IV.    Jurisdiction and Venue

10.     This Court has original jurisdiction over this appeal pursuant to 28 U.S.C. § 1331 because this case raises federal questions under the IDEA, Section 504, and the ADA.

11.     Plaintiffs have exhausted their administrative remedies where required under IDEA (20 U.S.C. § 1415(i)), having timely pursued a Special Education Due Process hearing.

12.     Plaintiffs' claims and remedies are authorized by 20 U.S.C. § 1415 and 28 U.S.C. §§ 2201 and 2202, providing for declaratory and any further relief deemed necessary and proper.

13.     All of the Defendant's actions have taken place within the jurisdiction of the United States District Court for the Eastern District of Pennsylvania. Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391.

## V.    Standard of Review

14.     This Court is required to undertake a fully independent review of the record and the hearing officer's decision. *Board of Educ. v. Rowley*, 458 U.S. 176, 206-07, 102 S.Ct. 3034 (1982).

15.     In conducting this independent review, district courts: (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and

basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate. 20 U.S.C. § 1415(i)(2)(B).

16.     The Third Circuit requires "a district court to apply a nontraditional standard of review when considering an appeal from a state administrative decision under IDEA" called modified de novo review. *Mary T. v. School District of Philadelphia*, 575 F.3d 235, 241 (3d Cir. 2009).

17.     Under modified de novo review, district courts shall accord "due weight" to the factual findings of the administrative agency. *S.H. v. School District of Newark*, 336 F.3d 260, 269 (3d Cir. 2003). "Due weight" means that although the district courts must consider the administrative fact findings, the courts are free to reject such findings. *Id.* at 269-70.

18.     Modified de novo review does not apply to Section 504 and ADA claims. *K.N. v. Glouster City Bd. Of Edu.*, 379 F.Supp.3d 334, 344 (D.N.J 2019). Thus, a federal district court applies a de novo standard of review for the Section 504 and ADA claims. *Id.* (*citing T.F. v. Fox Chapel Area Sch. Dist.*, 589 F.App'x 594, 598 (3d Cir. 2014)).

## VI.    Applicable Law

### A.    IDEA requires that a school district identify all children with disabilities who live in the district and conduct a special education evaluation.

19.     The purpose of the IDEA is to ensure that "all children with disabilities have available to them a free appropriate public education ("FAPE") that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).

20.     After a child is determined to be eligible, IDEA and its regulations provide for periodic reevaluations, which "may occur not more than once a year unless the parent and public

4

agency agree otherwise; and must occur at least once every three years, unless the parent and the public agency agree that an evaluation is unnecessary." 20 U.S.C. § 1414(a)(2)(B)(i), (ii); *see also* 34 C.F.R. § 300.303(b).

21.     School districts, however, also have the obligation to "ensure that a reevaluation of each child with a disability is conducted" at any time "the public agency determines that the educational or related service needs, including improved academic achievement and functional performance, of the child warrant a reevaluation; or if the child's parent or teacher requests a reevaluation." 20 U.S.C. §1414(a)(2)(A)(i), (ii); 34 C.F.R. 300.303(a).

22.     According to IDEA, school districts must, at a minimum, evaluate students with disabilities at least every three years, commonly known as a "triennial evaluation." 34 C.F.R. § 300.303(b)(2).

23.     In such evaluations, a school district must use a variety of assessment strategies to gather relevant information about the child, and must assess the child "in all areas related to the suspected disability." 34 C.F.R. § 300.304(c)(4).

24.     The public agency must ensure that a student's "evaluation is sufficiently comprehensive to identify all of the child's special education and related service needs, whether or not commonly linked to the disability category in which the child has been classified." 34 C.F.R. § 300.304(c)(6).

25.     Despite the pandemic, the United States Department of Education did not waive requirements that public school districts provide FAPE to students with disabilities. *See Questions and Answers on Providing Services to Children with Disabilities During the Coronavirus Disease 2019 Outbreak*, March 2020, available at, <https://sites.ed.gov/idea/idea-files/q-and-a-providing-services-to-children-with-disabilities-during-the-coronavirus-disease-2019-outbreak/#Q-A-1>.

26.    Public school districts' ongoing FAPE requirement also includes evaluating and obtaining the necessary data for  progress monitoring and Independent Educational Program ("IEP") development. *See id.*

**B.    After the school district identifies a student's needs in an evaluation report, the IEP Team must use the report to create an IEP and offer a student a Free Appropriate Public Education.**

27.    At the beginning of each school year, a school district is required to develop an IEP that provides a FAPE for each child with a disability who resides within its jurisdiction. 20 U.S.C. § 1414(d)(2)(A).

28.    Because a school district's obligation to offer FAPE derives from the child's residency in the community, even disabled students in private schools must be offered an IEP, and enrollment is not required to trigger the mandatory obligation to provide an offer of FAPE. *Shane T. v. Carbondale Area School District*, 2017 WL 4314555 at *9 (E.D.Pa. February 24, 2020); *see also I.H. v. Cumberland Valley School Dist.*, 842 F. Supp.2d 762, 772-73 (E.D. Pa. 2012) ("requiring enrollment as a prerequisite to obtaining an IEP . . . would be at odds with the 'remedial nature' of the IDEA").

29.    A resident child eligible for special education services is entitled to an offer of FAPE upon parent's request. *L.T. v. North Penn School District*, 2018 WL 6600206 at *7 (E.D.Pa. December 14, 2018). If that resident child is attending a privately-funded program, the child still has the right to an offer of a FAPE via a thorough evaluation and a proposed IEP. *Shane T., supra*, 2017 WL 4314555 at *9.

30.    The IDEA provides that an IEP team, which includes both school officials and the child's parents, must develop an appropriate educational program and placement for each eligible child through an IEP. A two-pronged analysis applies in reviewing a school district's IEP

development under the IDEA: (1) whether the District complied with the procedures set forth in the IDEA; and (2) whether the IEP developed through the IDEA's procedures is reasonably calculated to enable the child to receive meaningful educational benefit. *Board of Educ. v. Rowley*, 458 U.S. 176, 206-07, 102 S.Ct. 3034 (1982); *see also Endrew F. v. Douglas County School District RE-1*, ___ U.S. ___, 137 S. Ct. 988, 999 (2017).

31.     The United States Supreme Court in its decision in *Endrew F., supra*, emphasized that IDEA requires more than a program reasonably calculated to allow a student to make "some progress." *Endrew F.*, 137 S. Ct. at 997, 1000-01. Instead, IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 999.

32.     In addition, an "educational program must be appropriately ambitious in light of his circumstances," as minimal "progress from year to year can hardly be said to have been offered an education at all. The goals may differ, but every child should have the chance to meet challenging objectives." *Id.* at 999-1000.

33.     The progress standard set forth in *Endrew F.* is therefore consistent with, and expands upon, the standard that has been applied for many years in this Circuit, requiring that a student must receive a program that is reasonably designed to allow a student to make *meaningful* educational progress and achieve "significant learning." *Pennsbury Heights Area School Dist. v. B.M.*, 248 F. Supp. 3d 618, 632 (E.D. Pa. 2017).

34.     Furthermore, it is well-settled that "education" extends beyond discrete academic skill, and includes the social, emotional, behavioral, and physical progress necessary to move the child toward meaningful independence and self-sufficiency consistent with the child's cognitive potential. *M.C. v. Central Regional School District*, 81 F.3d 389, 393-94 (3d Cir. 1996); *see also*

*Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171, 181-82 (3d Cir. 1988).

    **C.**    **A school district is required to reimburse a parent for private school tuition where the district failed to offer an appropriate IEP and where the private school placement was appropriate.**

    35.    The Supreme Court established that when a school district's IEP is inappropriate, and when the parents obtain and pay for an appropriate private school program along with other equitable considerations, the school district must fund the private program provided by the child's parents. *School Comm. of Burlington v. Dept. of Educ. of Massachusetts*, 471 U.S. 359, 370-71, 105 S.Ct. 1996 (1985); *see also Florence County School Dist. v. Carter*, 510 U.S. 7, 14, 114 S.Ct. 361 (1993); 34 C.F.R. § 300.148(c).

    36.    As such, under IDEA, parents who disagree with their child's program and placement at a school district may unilaterally enroll their child in an appropriate out-of-district placement and obtain tuition reimbursement where a court determines that the school district has not offered an appropriate education for the child. *Shore Reg'l High School Bd. of Educ. v. P.S.*, 381 F.3d 194, 198-99 (3d Cir. 2004).

    37.    Under the test for tuition reimbursement from *Burlington, supra*, a court's first step is to determine whether the school district offered the student FAPE through an appropriate IEP. *Burlington*, 471 U.S. at 369-70.

    38.    After examining the written IEP, the court must determine whether the private school was appropriate. *Burlington*, 471 U.S. at 369-70.

    39.    The private school does not need to be the least restrictive environment, nor is it held to the same FAPE standards as the school district. *Florence County, supra*, 510 U.S. at 13-14.

    40.    Tuition reimbursement for a family's unilateral decision to place a child in a private

placement is appropriate if "the [school district] has not made free appropriate education available to the child in a timely manner prior to that enrollment." *Norristown Area School District v. F.C.*, 636 Fed. Appx. 857 (3d Cir. 2016) (not precedential).

41. Once a court determines a placement is appropriate, the court may still reduce the tuition reimbursement if the court finds that an equitable reduction is necessary after examining (1) whether the parents informed the school district of their intent to remove the student, (2) whether the parents made their child unavailable for a reevaluation, or (3) whether the parents otherwise acted unreasonably. 34 C.F.R. § 300.148(d).

**D.** **A student may also bring a tuition reimbursement claim under Section 504 and the ADA.**

42. Under Section 504, recipients of federal funds such as the District are required to "provide a free appropriate public education [FAPE] to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. § 104.33(a). The term "appropriate education" is defined as "the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of the handicapped persons as adequately as the needs of non-handicapped persons are met and (ii) are based on adherence to the procedures that satisfy the requirements of Section 104.34, 104.35, and 104.36." 34 C.F.R. § 104.33(b).

43. Similar to IDEA, Section 504 and its regulations require the identification of all children with disabilities and the provision of appropriate educational services. 29 U.S.C. § 794; *see also* 34 C.F.R. § 104.1 *et seq.*

44. Section 504 requires that "a public elementary or secondary education program shall annually undertake to identify and locate every qualified handicapped person residing in the

recipient's jurisdiction who is not receiving a public education and take appropriate steps to notify handicapped persons and their parents or guardians of the recipient's duty under this subpart." 34 C.F.R. § 104.32; *see also Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 253 (3d Cir. 1999).

45.     "When a state fails to provide a disabled child with a free and appropriate education, it violates the IDEA. However, it also violates [Section 504] because it is denying a disabled child a guaranteed education merely because of the child's disability. It is the denial of an education that is guaranteed to all children that forms the basis of the claim." *Andrew M. v. Delaware Cty. Office of Mental Health and Mental Retardation*, 490 F.3d 337, 350 (3d Cir. 2007).

46.     Thus, the substantive requirements of Section 504 in the education context are largely, but not entirely, equivalent to the requirements under the IDEA. *James S. v. School Dist. of Phila.*, 559 F. Supp.2d 600, 620 (E.D. Pa. 2008).

47.     A school may violate Section 504 independent of any violations of IDEA. *See Lauren G. v. West Chester Area School Dist.*, 906 F.Supp.2d 375 (E.D. Pa. 2012) (granting tuition reimbursement for school district's failure to provide FAPE under Section 504 during period for which no relief was granted under IDEA).

48.     To establish a violation of Section 504, a plaintiff must prove that: (1) he is "disabled" as defined by the Act; (2) he is "otherwise qualified" to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) he was excluded from participation in, denied the benefits of, or subject to discrimination at, the school. *Ridgewood*, 172 F.3d at 253.

49.     Tuition reimbursement is an available remedy under Section 504, as well as under IDEA. *Molly L. v. Lower Merion School Dist.*, 194 F.Supp.2d 422, 429 n.7 (E.D.Pa. 2002) ("Tuition reimbursement has been awarded in cases arising under both the Rehabilitation Act and

IDEA.").

50.     The ADA provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." The Third Circuit has held that the ADA "extends the nondiscrimination rule of [Section 504] to services provided by any 'public entity' (without regard to whether the entity is a recipient of federal funds)." *Jeremy H. v. Mount Lebanon School Dist.*, 95 F.3d 272, 279 (3d Cir. 1996). That court held that "the remedies, procedures, and rights" applicable to Section 504 claims are the same as those under the ADA. *Id.*; *see also Tereance D. v. School Dist. of Philadelphia*, 548 F. Supp.2d 162, 169-70 (E.D.Pa. 2008) (applying same analysis to claims under ADA as to claims under Section 504).

51.     The IDEA, Section 504, and the ADA all permit the recovery of reasonable attorneys' fees by parents who prevail in an action or proceeding thereunder. 20 U.S.C. § 1415; 42 U.S.C. § 12205; 34 C.F.R. § 300.517; 29 U.S.C. § 794a.

## VII.   Factual History

52.     Plaintiffs incorporate by reference the preceding paragraphs.

53.     According to the School District's most recent Reevaluation Report ("RR") dated April 27, 2021, Ruari is a student with overall extremely high cognitive ability and is primarily identified under the IDEA as eligible for services as a child with Autism, with secondary disability categories of Other Health Impairment ("OHI") and Speech and Language Impairment ("SLI").

54.     Ruari was also diagnosed with Attention Deficit Hyperactivity Disorder/Inattentive Type ("ADHD") in a private evaluation conducted during Ruari's fifth grade year (the 2017-2018 school year).

55.     However, Ruari continues to present with needs in speech and language skills including speech articulation, as well as needs in attention and focus, self-regulation, executive functioning, avoidance of non-preferred tasks, and social skills.

56.     During the 2015-16 school year, which was Ruari's third grade year, the Parents came to believe that the District was failing to provide a FAPE to Ruari and unilaterally placed him in a private, parochial school. The parties then entered into a settlement agreement. Under the terms of the settlement agreement, the District paid his tuition at the private school, provided an aide at the school, and provided additional funding for the parents to obtain related services and additional supports. The parties extended the settlement agreement several times. As a result, Ruari remained at the private school at the District's expense through the 2020-21 school year, which was Ruari's eighth grade year.

57.     As the private school he was attending ended at eighth grade, and consistent with the terms of the settlement agreement, on or about March 2, 2021, the District issued a permission form to reevaluate Ruari, which the Parents signed and returned promptly.

58.     The District's April 2021 RR incorrectly determined that Ruari was an eligible student under the primary category of Autism.

59.     The School District evaluated Ruari and issued its report on April 27, 2021, and a subsequent IEP was issued on May 26, 2021.

60.     The Hearing Officer found that the District did not appropriately assess Ruari for Autism: "procedurally, the ADOS-2 administration that was part of the 2021 RR did not comply with 20 U.S.C. § 1414(b)(3)(A)(v) because it was not administered in accordance with instructions provided by the ADOS-2 producer." Hearing Officer Decision ("HOD"), 18.

61.     The Autism Diagnostic Observation Schedule, Second Edition ("ADOS-2") is a

standardized, individually administered assessment tool comprised of a series of activities aimed to provide opportunities for the examiner to observe behaviors related to the educational classification of Autism.

62.     The ADOS-2, when appropriately administered, provides an overall score indicating the likelihood, or lack thereof, of the presence of Autism.

63.     The Hearing Officer found that "[t]he evaluator's compliance with COVID-19 safety protocols required deviation from the standardized ADOS-2 protocol." HOD, 7.

64.     Because the ADOS-2 was administered without following proper testing protocols, the assessment could not be scored.

65.     More specifically, the evaluator stated in her report that: "Due to the COVID-19 pandemic, several health and safety precautions were taken for the test session . . . . As a result, observations of [Student's] social communication skills were impacted. The health and safety measures taken do not align to the standardized practices of this assessment and would have an impact on [Student's] obtained scores. Due to that, the assessment was not scored. Rather, the anecdotal observations made during the ADOS-2 administration will be used in conjunction with the other assessment measures used for this reevaluation to determine the presence of behaviors typically associated with the educational classification of Autism." HOD, 7-8.

66.     The only other clinical assessment for Autism that the District's evaluator administered was the Autism Spectrum Rating Scale ("ASRS"), which is a nationally standardized, norm-referenced rating scale that helps to identify symptoms, behaviors, and associated features of Autism Spectrum Disorders in children and adolescents.

67.     On the ASRS, Ruari's teacher noted only a slightly elevated total score and the Parent noted an average total score.

68.    Neither of the scores from the ASRS are indicative of autism.

69.    Additional testing completed by the District as part of its April 2021 RR further supports the conclusion that Ruari does not meet the criteria for Autism under the IDEA.

70.    Autism is primarily a communication disorder, as noted in IDEA's definition of Autism:

> Autism means a developmental disability significantly affecting verbal and nonverbal communication and social interaction, generally evident before age three, that adversely affects a child's educational performance. Other characteristics often associated with autism are engagement in repetitive activities and stereotyped movements, resistance to environmental change or change in daily routines, and unusual responses to sensory experiences.

34 C.F.R. §300.8(c)(1)(i).

71.    However, the District's speech and language testing completed as part of the 2021 reevaluation, reveals no such communication disorder for Ruari beyond articulation.

72.    The Hearing Officer found that "[t]he Speech [and] Language Pathologist who conducted this evaluation concluded that the Student continued to require Speech Therapy for articulation issues, but that expressive and receptive language were strengths for the Student." HOD, 6.

73.    In fact, except for articulation, Ruari scored in the average to very high range in all areas of language/communication assessed, including pragmatic or social language, which is very atypical for a student on the Autism Spectrum.

74.    The Hearing Officer found that "[i]n substance, I agree with the Parents that evidence supporting an Autism classification was weak when the 2021 RR was completed. The ADOS-2 was administered in a non-standardized way and was not scored." HOD, 19.

75.    The Student's Full Scale IQ was found to be 130, which is in the "Extremely High" range.

76.     The various sub-test scores that make up the Full Scale IQ were all in the High Average to Extremely High ranges, except for the Student's Processing Speed Index. That score was exactly average (a standard score of 100, which is in the 50th percentile).

77.     It is typical for students with ADHD to have relative needs in processing speed.

78.     Because the ADOS-2 was not properly administered, the results of the ASRS did not indicate the presence of Autism, and the speech and language evaluation evidenced strong pragmatic and social language skills, the 2021 RR did not contain a properly administered assessment that indicated the presence of Autism.

79.     Nevertheless, the District used the inappropriate 2021 RR to draft an IEP for Ruari and used it to make a recommendation as to his special education placement.

80.     Because the 2021 RR did not conduct a valid, comprehensive evaluation of Ruari, including improperly administering the ADOS-2, the District offered an inappropriate IEP that did not provide a FAPE.

81.     The resulting IEP contained four basic and generic goals: one to increase on-task behavior; one to improve social communication; one to increase effective communication skills; and one regarding Ruari's giftedness in the science curriculum.

82.     The IEP includes no goals related to Ruari's weaknesses in executive functioning, his struggles with anxiety, or his struggles with focus and attention.

83.     The IEP also fails to include sufficient supports to address his needs for a smaller classroom environment and his transition back from a smaller, supportive private school.

84.     The IEP proposed insufficient academic supports and inadequate supports for Ruari's weaknesses in social skills, social communication, executive functioning, and sensory/self-regulation.

15

85.    The IEP also places Ruari in an autistic support classroom for at least 90 minutes every other day.

86.    The Parents identified HGP as an appropriate placement for Ruari and provided appropriate written intent of their decision to place Ruari with a request for the District's support of tuition.

87.    In response, the IEP team reconvened on or about August 27, 2021. However, the resulting IEP is virtually identical to the May 26, 2021 IEP and continues to fail to offer appropriate programming and placement for Ruari for the same reasons, including the large classroom environment that simply cannot meet Ruari's ADHD, executive function, and social-emotional needs and the continuation of his inappropriate placement in autistic support. As such, the Parents moved forward with Ruari's placement at HGP for the 2021-2022 school year.

88.    After reviewing the April 2021 RR and May 2021 IEP and the basis on which the District found Ruari eligible as a student with Autism, the Parents disagreed with the District's findings and sought the professional opinion of an independent evaluator, Holly Cohen, who evaluated Ruari in the early Fall of 2021.

89.    Ms. Cohen's evaluation of Ruari assessed all areas of suspected need. The evaluation procedures also included a thorough review of Ruari's available educational records, a lengthy observation in a least two different settings, an extensive interview with Ruari, input from the Parents, input from Ruari's treating psychologist and his tutor, and input from Ruari's current teachers.

90.    Ms. Cohen followed all of the protocols of the ADOS-2 and correctly administer the ADOS-2.

91.    Ms. Cohen determined that Ruari does not meet the criteria for an Autism

classification, and ultimately found Ruari to be exceptional and eligible for special education support under the eligibility criteria for OHI due to his ADHD and accompanying areas of need.

92.     Ms. Cohen also makes a variety of reasonable recommendations for specially designed instruction, accommodations, supports, and placement. These recommendations include, among others, a smaller academic focused environment; a robust offering of academic, emotional, social, and behavioral supports should Ruari need them; an opportunity for Ruari to establish a safe level of social comfort; and the participation in a social skills group. Ms. Cohen also recommends instruction in executive function skills and instructional strategies to improve reading comprehension, vocabulary development, and working memory.

93.     During her testimony, Ms. Cohen explained that a placement in an autistic support classroom was inappropriate for Ruari.

94.     While the District did reconvene an IEP meeting on March 15, 2022, almost three months after the family provided the District with a copy of Holly Cohen's report, the March 2022 IEP is inappropriate. The March 2022 IEP is virtually the same as the August 2021 IEP, except for a few new Specially Designed Instruction ("SDI").

95.     The Hearing Officer referred to the added SDIs as "generic."

96.     Moreover, the March 2022 IEP failed to meaningfully consider Ms. Cohen's evaluation, making absolutely no reference to it in the IEP and continues the same inappropriate placement in autistic support

97.     HGP is a college preparatory school for young men in grades nine through 12, located in Bensalem, Pennsylvania. HGP is accredited/licensed by the Pennsylvania Association of Independent Schools and Middle States Association for Secondary School Accreditation for Growth. HPG has a total enrollment of 420 students and a teacher to student ratio of nine to one,

and Ruari's class size during the 2021-22 school year ranged from 13 to 18.

98.    Ruari's class schedule included Honors Communication Skills, Advanced Placement Human Geography, Faith and Christian Living, Honors Biology, Design Thinking Latin I, Honors Algebra II, and Introduction to Art. Ruari also participated in HGP's Montgomery Program, which is designed for students who require accommodations and supports.

99.    Ruari has an Academic Accommodation and Support Plan, which provides for certain accommodations and supports, including the provision of learning support two times per cycle with a learning specialist to address executive functioning skills (to include self-regulation/emotional regulation, initiating and completing tasks, study skills, and social skills) and time management skills.

100.    In addition, Ruari has an opportunity to meet with ELA (English Language Arts) and Math tutors contracted through Catapult Learning as part of his day at HGP. These opportunities occur weekly, and do not interfere with his learning support time.

101.    In addition to accommodations listed in his Academic and Support Plan, Ruari receives additional accommodations from his teachers as may be necessary. Ruari also has access to a guidance counselor at HGP on an as-needed basis and participates in the following extracurricular activities with other students: tennis team and robotics.

102.    Ruari has done well at HGP as reflected by his progress and grades in his report cards and progress reports.

103.    HGP staff believe Ruari has been making appropriate progress while at HGP, and that his academics, social-emotional, and behavioral needs are being met. The size of the school and Ruari's classes have contributed to his success at HGP.

## VIII.  **The Hearing Officer's Errors**

104.    The Plaintiff incorporates by reference the preceding paragraphs.

105.    The Officer erred by excusing the District's failure to appropriately evaluate Ruari, including by properly administering all assessments used and relied upon in the evaluation, and by concluding that the District offered Ruari FAPE through its May 2021 IEP.

106.    The District unquestionably failed in its statutory duties to Ruari and the Hearing Officer erred in ruling otherwise and in failing to award tuition reimbursement as relief.

107.    The May 25, 2021 IEP was not a lawful offer of FAPE because the School District failed to comprehensively evaluate Ruari.

108.    The COVID-19 pandemic did not relieve the District of its legal obligation to evaluate Ruari.

109.    The Hearing Officer mistakenly used the COVID-19 pandemic to excuse the District's failure to properly evaluate Ruari:

> While evidence supporting an Autism classification was weak, that weak evidence was also the best information that the District could gather at the time. The evaluator acknowledged that the COVID-19 safety protocols diminished the value of some tests and used that caution while applying her professional judgement. Under the circumstances, it was not unreasonable for the evaluator to conclude that the Student should be classified as a child with Autism at the time of the 2021 RR.

HOD, 19.

110.    The question before the Hearing Officer was not whether Ruari presented with Autism given the use of COVID-19 safety protocols; rather, the question is whether he has autism using properly administered evaluation tools.

111.    Ironically, the Hearing Officer stated that he agreed "that COVID-19 school closures and safety measures do not abrogate any child's right to a FAPE . . . [and that] COVID-

19 safety measures cannot be used as a defense against an inappropriate evaluation." HOD, 19, n.12.

112.    The Hearing Officer then erroneously concludes, without citation to the record, that the District's evaluator relied only upon "multiple measures and assessments, most of which were not altered in any way" to determine that Ruari has autism. HOD, 19.

113.    However, all of the other measures show that he in fact does not have autism.

114.    Using properly administered evaluation tools, it is obvious Ruari does not have autism.

115.    Because it did not conduct a valid, comprehensive evaluation of Ruari, including improperly administering the ADOS-2, the District offered an inappropriate IEP that did not provide a FAPE.

116.    Although the Hearing Officer correctly found a procedural violation of IDEA (by virtue of the invalid ADOS-2 testing), the Hearing Officer erred by failing to find a substantive violation of IDEA.

117.    The District erroneously came to this conclusion based on two assessments: a non-standardized and therefore unscored administration of the ADOS-2 and ASRS, the results of which indicated that Ruari was not on the autism spectrum.

118.    The dispute over Ruari's classification centers primarily on one assessment, the ADOS-2, that was administered both by the School District as well as by the Family's independent evaluator, Holly Cohen.

119.    The District relies on its improper administration of the ADOS-2 to conclude that Ruari meets the criteria for Autism, while Ms. Cohen's administration, which complied with all testing protocols and was properly administered, yields the opposite results.

120. The School District incorrectly identified Ruari as eligible under the classification of Autism.

121. To the extent that Ruari displays difficulties with social interaction or can be rigid at times or displays other behaviors that are also present in students with Autism, those behaviors are not to the level one would expect for a student on the spectrum and are consistent with and far better explained by his ADHD.

122. The District relied upon its inappropriate evaluation and incorrect identification of Ruari to develop his program and placement, which, in addition to a variety of other deficiencies rendering the program and placement inappropriate, wrongly concludes that Ruari requires autistic support and inappropriately places Ruari in an autistic support classroom for a portion of his day.

123. The District's April 2021 RR incorrectly determined that Ruari was an eligible student under the primary category of Autism.

124. The District's administration of the ADOS-2 was invalid and cannot be relied upon.

125. The Hearing Officer erred by concluding that "even if the District misidentified the Student as a child with Autism, that error would have been procedural—not substantive." HOD, 20.

126. The School District offered an autistic support placement.

127. However, at the time, Ruari was attending a parochial school in the general education environment and was obtaining a meaningful educational benefit from his private school.

128. In the circumstances of this case, the identification of the child was of paramount importance because it offered to change his placement to an inappropriate placement.

129. The Hearing Officer erred by concluding that "[n]othing in the definition of Autistic

Support [in chapter 14 of the Pa. Code.] precludes non-Autistic students from receiving similar services . . . ." HOD, 21.

130.   The Hearing Officer's justification for the misidentification of Ruari—by concluding that a student without autism can be educated in an autistic support classroom—is error because the Hearing Officer failed to analyze whether the District offered placement met the demanding requirement of providing a FAPE.

131.   Simply because the PA Code does not prevent a child without autism from being educated in an autistic support classroom, does not mean that misidentifying him and offering him such a placement is a valid offer of a FAPE.

132.   Having established that the District failed to offer Ruari a FAPE through the invalid 2021 RR, the Family unmistakably fulfilled the first prong of the *Burlington/Carter* tuition reimbursement analysis, and the Hearing Officer erred in concluding to the contrary.

133.   Because the Hearing Officer mistakenly found that the District offered Ruari a FAPE, the Officer did not consider the two additional prongs of the tuition reimbursement analysis: the appropriateness of the Private School, and whether the equities call for any reduction in the tuition award; however, it is clear that the Parents met their burden of proof regarding these prongs as well.

134.   As described above, the evidence demonstrated that HGP is an appropriate placement for Ruari.

135.   There is no equitable reason to reduce a tuition reimbursement award.

136.   The Family fully cooperated with the District's evaluation in March of 2021.

137.   The Family's decision to enroll Ruari at HGP was made in good faith after considering the District's faulty evaluation and the District's erroneous decision to offer a

placement in an autistic support classroom.

138.    The Family completed all necessary paperwork and signed the necessary releases for the District to evaluate the Student and obtain records from outside providers.

139.    The Family made Ruari available for testing.

140.    The Family participated in all IEP meetings.

141.    Because the Family met the third prong of the tuition reimbursement analysis, there is no equitable basis to reduce or deny tuition reimbursement.

142.    The District's failure to offer Ruari a non-discriminatory, appropriate educational environment resulted in him being excluded from participation in, denied the benefits of, or subject to discrimination in, him education in violation of not only IDEA, but Section 504 and the ADA as well.

143.    The Hearing Officer therefore erred in not awarding tuition reimbursement under not only IDEA, but Section 504 as well.

**WHEREFORE**, the Plaintiffs respectfully request that this Court:

1.    Assume jurisdiction over this action;

2.    Hear additional evidence pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii);

3.    Reverse the Hearing Officer's Decision and award the Family tuition reimbursement and related costs for 2021-2022 school year at HGP and until such time as the District offers an appropriate placement;

4.    Order the Defendant to pay Plaintiffs their reasonable attorneys' fees and related costs;

5.    Declare the Defendant's actions and omissions to be violative of IDEA, Section

504, ADA; and Pennsylvania law; and

6.    Grant such other relief as this Court deems proper.

Respectfully submitted,

D. Daniel Woody, Esquire
Pennsylvania ID No. 309121

Michael J. Connolly, Esquire
Pennsylvania ID No. 82065

Dennis C. McAndrews, Esquire
Pennsylvania ID No. 28012
McANDREWS, MEHALICK, CONNOLLY,
HULSE and RYAN, P.C.
30 Cassatt Avenue
Berwyn, Pennsylvania 19312
Tele: 610-648-9300

Counsel for Plaintiffs