IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RUARI C., *by and through his Parents*, RONAN C. and BETH C., <br><br>                    *Plaintiffs,* <br><br>        v. <br><br>PENNSBURY SCHOOL DISTRICT, <br><br>                    *Defendant.* | CIVIL ACTION <br> NO. 22-4080 |

**PAPPERT, J.**                                                                                    August 18, 2023

### MEMORANDUM

Ruari C., through his parents, filed an administrative due process complaint against Pennsbury School District alleging the District failed to offer Ruari a free, appropriate public education for the 2021–2022 school year when it proposed an allegedly inappropriate Individualized Education Plan based on what they felt was a flawed evaluation. (Compl. 2, ECF 1.) Ruari's parents seek tuition reimbursement from the District for Ruari's placement in a private school during that year and until the District develops an appropriate program for Ruari. (*Id.*) After a hearing, the Hearing Officer held the District offered Ruari an appropriate IEP, and that his parents were not entitled to tuition reimbursement. (Hr'g Officer's Op. 23–24, ECF 5-3.)

Ruari's parents bring this lawsuit under the Individuals with Disabilities Education Act, Section 504 of the Rehabilitation Act of 1973, the Americans with Disabilities Act of 1990, the federal and state regulations implementing those statutes, as well as Chapters 14 and 15 of the Pennsylvania Code. Ruari's parents and the District filed cross motions for judgment on the administrative record. (ECF 12 and

1

13.) After thoroughly reviewing the underlying record and all of the parties' submissions, the Court agrees with the Hearing Officer's Final Decision and Order. The Court grants accordingly the District's Motion, denies the parents', and enters judgment in favor of the District.

I

A

Ruari, a tenth-grade student, lives with his parents in Pennsbury School District. (Hr'g Tr. 5/20/22 at 25:11–13, ECF 5-7.) Ruari attended Makefield Elementary School in the District until third grade. (*Id.* at 37:14–20; Ex. P5 at 5, ECF 5-9.) In 2016, while at Makefield, the District conducted a full evaluation of Ruari and found he met the criteria for special education services under the IDEA for the educational disability categories of autism, other health impairment, and speech or language impairment. (Ex. S-2 at 5, ECF 5-8). Shortly thereafter and during the third-grade school year, Ruari began attending the private St. Ignatius School. (Hr'g Tr. 5/20/22 at 26:2–6, ECF 5-7.) Pursuant to an unrelated settlement between Ruari's parents and the District, the District covered the cost of Ruari's tuition at St. Ignatius from third grade through eighth grade. (*Id.*; Hr'g Officer's Op. 3, ECF 5-3; Ex. S-5 at 1–2, ECF 5-8). In the settlement, the District agreed to reevaluate Ruari and offer an IEP for the 2021–2022 school year. (Hr'g Officer's Op. 3, ECF 5-3.)

At St. Ignatius, Ruari received speech and language programing, tutoring, a full-time aide provided by the District, and occupational therapy services beyond the school's typical educational program. (Hr'g Tr. 5/20/22 at 37:24–38:7, ECF 5-7.) Ruari's parents explained that he did "very well" at St. Ignatius. (Ex. S-5 at 2, ECF 5-6.) In the summer before Ruari started eighth grade at St. Ignatius, he applied to Holy Ghost

Preparatory School and other local private high schools (Hr'g Tr. 5/20/22 at 66:6–67:5, ECF 5-7), although his mother testified that the family also continued to consider Pennsbury High School for ninth grade. (*Id*. at 66:6–67:5.) On May 4, 2021, Ruari's family paid a thousand-dollar deposit to HGP. (Hr'g Tr. 6/8/22 at 236:14, ECF 5-6.) Ruari's father testified this was done as a "back up" plan, as they doubted whether the District would offer Ruari a program for the following year. (*Id*. at 237:20–25.)

B

Further to the parties' earlier settlement, the District reevaluated Ruari at the end of eighth grade. (*Id*. at 238:8–18.) On April 27, 2021, Dr. Alison Smith, Supervisor of Special Education at Pennsbury School District, issued her Reevaluation Report after conducting cognitive, academic, and functional behavioral assessments of Ruari. (Hr'g Tr. 5/20/22 at 93:15–94:3, ECF 5-7.) These assessments included tests, observations and input from both Ruari's parents and his teachers at St. Ignatius. (*Id*. 94:9–96:12.) Some testing modifications were implemented due to the COVID-19 pandemic, including having Ruari and Dr. Smith wear masks and use plexiglass dividers between them. (*Id*. at 98:13–99:8.) For her cognitive assessment, Dr. Smith used the WISC-V test, which indicated that Ruari's verbal comprehension was in the extremely high range. (*Id*. at 100:16–101:4; Ex. S-2 at 10, ECF 5-8). His visual spatial index was in the high-average and very high-average range. (Hr'g Tr. 5/20/22 at 100:5–11, ECF 5-7.) His working memory index was in the high-average range and his processing speed in the average range. (*Id*. at 100:12–20.) Dr. Smith determined that Ruari's overall IQ was in the extremely high range, and that he had a full-scale IQ of 130 and is considered gifted. (*Id*. at 100:21–25.) Additionally, Ruari scored in the average range

on the WIAT-4 test, which was administered to assess Ruari's academic skills. (Ex. P6 at 12–13, ECF 5-9.)

Along with additional academic, reading, functional behavior and speech and language assessments addressed in his Reevaluation Report (Ex. S-2 at 13–19, 27–30, ECF 5-8), the District administered behavioral and emotional assessments. These included the BASC-3 and the BRIEF-2 assessments, and both consisted of an analysis of questionnaire forms submitted by Ruari's parents and teachers. (*Id.* at 22–25.) The BASC-3 forms Ruari's teachers submitted indicated that Ruari exhibited "clinically significant" levels of "atypicality" and "withdrawal." (*Id.* at 23.) A BASC-3 score "in the Clinically Significant range suggests a high level of maladjustment." (*Id.*) Ruari's parents submitted a form indicating behavioral levels in all categories in the average range. (*Id.*) The Reevaluation Report noted that the two scores are "quite unique," and that the "rating variations might be related to environmental difference," or the "differences may also be related to personal experience and opinion about behavior. Ruari's teachers may view particular behaviors or reactions as being atypical, while his parents may not." (*Id.*) On the BRIEF-2 form, Ruari's parents reported no concerns, while his teachers expressed some executive functioning concerns. (*Id.* at 24–25.)

Additionally, the District used the Autism Diagnostic Observation Schedule (ADOS-2) as part of its behavioral and emotional evaluation to determine if Ruari exhibited behaviors characteristic of autism. (Hr'g Tr. 5/20/22 at 102:22–103:3; Ex. S-2 at 20, ECF 5-8.) School psychologist Michelle Galanek administered a modified ADOS-2 due to COVID-19 safety protocols; these modifications included the wearing of masks, the sanitizing of testing materials and the use of a reduced number of testing materials to decrease the number of items requiring disinfection during the examination. (*Id* at

104:7–20.) The modifications impacted Galanek's observation of Ruari's communication skills, and as a result, she was unable to score the ADOS-2. (*Id.* at 104:24–105:5.) She did, however, record her observations in her conclusions. (*Id.*) Based on the ADOS-2, the District found that "Ruari demonstrated difficulties with reciprocal social interaction and communication, difficulty with flexible thinking and imaginative play, some difficulty fully understanding emotional responses, difficulties forming and maintaining social relationships, behavioral rigidity, and repetitive behaviors." (Ex. S-2 at 22, ECF 5-8.)

The Reevaluation Report stressed that "[t]he results of the ADOS-2 should be used in conjunction with the additional assessment measures utilized within this reevaluation." (*Id.* at 22.) In addition to the ADOS-2, and "[d]ue to a history of a classification of Autism," the District solicited feedback from Ruari's parents and teachers for its evaluation using the Autism Spectrum Rating Scales (ASRS). (Ex. S-2 at 25, ECF 5-8; Hr'g Tr. 5/20/22 at 105:11–107:25..) Based on the ASRS forms circulated among Ruari's teachers for input, Ruari exhibited characteristics consistent with Autism Spectrum Disorder. (Ex. S-2 at 26, ECF 5-8.) His teachers' ASRS forms indicated "Social/Communication," "Peer Socialization" and "Social/Emotional Reciprocity" issues in the very elevated range. (*Id.* at 26.) His parents noted "Unusual Behaviors" and "Behavioral Rigidity" were in the slightly elevated range. (*Id.*) In total, the parents' form showed average levels of features characteristic of autism while the teachers' forms evidenced slightly elevated levels of such features. (*Id.*) The analysis of the ASRS concluded that:

> In summary, the teacher form indicated that Ruari has symptoms directly related to the DSM-5 diagnostic criteria, and is exhibiting many of the associated features characteristic of Autism Spectrum

5

> Disorder. The parent form indicated some characteristics of an Autism Spectrum Disorder, but not enough of the characteristics to indicate an Autism Spectrum Disorder.

(Ex. S-2 at 26, ECF 5-8.) The District's conclusion based on these tests and additional observations was that Ruari met the autism diagnosis criteria for educational purposes. (Hr'g Tr. 5/20/22 at 107:14–17.)

The District also conducted a gifted evaluation, determining Ruari qualified for gifted programming. (Ex. S-2 at 19, ECF 5-8.) As a result of all of the evaluations, the District deemed Ruari eligible for special education due to a primary disability category of autism and secondary disability categories of other health impairment and speech and language impairment. (Hr'g Tr. 5/20/22 at 118:14–18; Ex. S-2 at 30–31, ECF 5-8.) The Reevaluation Report also deemed Ruari eligible for special education due to giftedness. (*Id.*)

The District proposed an IEP in May of 2021 that provided Ruari with support in the areas of need identified in the Reevaluation Report, including addressing off-task behaviors, social skills, and articulation. (Hr'g Tr. 5/20/22 at 26:16–23, 39:13–20; Ex. S-3 at 14, ECF 5-8.) Of particular relevance, the May 2021 IEP provided direct instruction on social skills, including through instruction in the Autistic Support Classroom for ninety minutes every other day; the remainder of Ruari's school day would be spent in regular education. (Ex. S-3 at 29, ECF 5-8.) The Autistic Support Classroom would never contain more than eight pupils. (Hr'g Tr. 5/20/22 at 26:24–27:1, ECF 5-7.) Ruari's regular education classes would contain between twenty and twenty-four students. (*Id.* at 27:2–4.) Furthermore, Ruari's special education support was classified as "itinerant," meaning it would never exceed twenty percent of the school

day. (Ex. S-3 at 35, ECF 5-8.) More precisely, the IEP calculated that Ruari would spend ninety percent of the school day in the regular education classroom. (*Id*. at 26).

C

Ruari's parents were dissatisfied with the May 2021 IEP, disagreeing specifically with the autism diagnosis. (Hr'g Tr. 5/20/22 at 27:7–13; 41:24–25, ECF 5-7.) On August 12, 2021, they told the District so and said they were placing Ruari in a private school for which they wanted tuition reimbursement. (*Id*. at 27:10–13; Ex. P10, ECF 5-9.)) On August 27, the District convened another IEP meeting in an effort to address the parents' concerns. (Ex. S-4 at 13, ECF 5-8.) At that meeting, Ruari's parents claimed Pennsbury High School was too large, that Ruari would benefit from a smaller setting, and expressed concerns about an incident that occurred between Ruari and another student when Ruari was a third grader. (*Id*.) In response, the IEP team informed the parents of the individual class sizes and the courses that were proposed for Ruari, and noted how the support classroom would provide Ruari with direct instruction in social skills—an area in which he required particular support. (*Id*.) The District offered the same educational programming, including in the Autistic Support Classroom, offered in the May 2021 IEP. (Hr'g Tr. 5/20/22 at 27:14–20, ECF 5-7), which the parents ultimately rejected (Ex. S-4 at 52–53, ECF 5-8).

For ninth grade, Ruari's parents enrolled him at HGP, a private, male, college-preparatory school in Bensalem, Pennsylvania. (Hr'g Tr. 5/20/22 at 8:4–8; HGP Stipulation of Fact ¶1, ECF 11-1.) As a freshmen at HGP, Ruari no longer required the support of an aide or occupational therapy services (Hr'g Tr. 5/20/22 at 38:8–18, ECF 5-7), but he was enrolled in the school's Montgomery Program, which allows him to meet with a learning support specialist twice a week for roughly forty-five minute sessions.

7

These sessions vary in group sizes ranging from one-on-one instruction to meetings with up to three other students. (*Id* at. 56:10–14; 60:22–61:2; 87:17–21.) He also has access to a third-party tutoring program that takes place during the school day. (*Id*. at 86:7–20.) Ruari also continues to receive private speech and language services. (*Id*. at 38:11–14, 18–22; 63:5–12.)

Ruari's parents hired Holly Cohen, a private school psychologist, to conduct her own evaluation. (*Id*. at 27:21–24; Ex. P13, ECF 5-9; Ex. S-5, ECF 5-8.) Cohen's work consisted of testing and multiple evaluations at the family's home, along with observation sessions at HGP. (Ex. S-5, ECF 5-8.) She addressed cognitive, academic, behavioral, executive functioning, and autism testing. (*Id*.) Her autism evaluation consisted of observations, input from Ruari's parents and teachers on the CARS2-QPC and CARS-2 forms and a readministering of the ADOS-2. (*Id*.) Cohen and Ruari both wore masks during Cohen's administration of the ADOS-2, with Cohen noting that the "ADOS-2 re-administration for this assessment can be considered nonstandard as masks were worn due to the pandemic; however, ADOS-2 protocol was followed." (Ex. S-5 at 29, ECF 5-8; Hr'g Tr. 6/8/22 at 170:15–20, ECF 5-6.) Unlike the District, Cohen was able to score her ADOS-2 administration. (Hr'g Tr. 6/8/22 at 182:18–20, ECF 5-6.) Cohen found that Ruari did not meet the criteria for an autism classification (*id*. at 185:25–186:1), and she testified that the Autistic Support Classroom was not appropriate for Ruari. (*Id*. at 196:4–8.)

The parents sent the results of Cohen's evaluation to the District on December 23, 2021, and the IEP team met again on March 15, 2022, to discuss them. (Hr'g Tr. 5/20/22 at 27:25–28:5, ECF 5-7; Ex. P16, ECF 5-9.) The District developed another IEP after that meeting, but it too failed to assuage the parents' concerns because it still

8

included the Autism Support Classroom. (Hr'g Tr. 5/20/22 at 55:5–14, ECF 5-7.) Ruari's mother testified that Ruari is "thriving" at HGP (*id.* at 58:5), and his parents credit HGP's small class sizes for Ruari's success and believe HGP "better suited for Ruari's needs." (Ex. S-5 at 2, ECF 5-8.)

II

A district court applies a "modified *de novo*" standard when reviewing an administrative hearing officer's decision under the IDEA and Section 504. *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010). Conclusions of law receive plenary review. *Carlisle Area Sch. v. Scott P. ex rel. Bess P.*, 62 F.3d 520, 528 n.3 (3d Cir. 1995). The hearing officer's factual findings are given "due weight" and considered *prima facie* correct, and if the Court departs from those findings, it must explain why. *D.S.*, 602 F.3d at 564. The Court must accept the hearing officer's credibility determinations "unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion." *Id.* (emphasis omitted) (internal quotation omitted). "The court is not, however, to substitute its own notions of sound educational policy for those of local school authorities." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 268 (3d Cir. 2012) (quotation omitted). The party challenging the hearing officer's decision bears the burden to "persuade the factfinder that one's propositions of fact are indeed true." *Id.* at 270–71 (quoting *El v. Se. Pa. Transp. Auth. (SEPTA)*, 479 F.3d 232, 238 (3d Cir. 2007)). Claims under Section 504 of the Rehabilitation Act and the ADA are reviewed *de novo*. *See K.N. v. Gloucester City Bd. of. Educ.*, 379 F. Supp. 3d 334, 344 (D.N.J. 2019) (citing *T.F. v. Fox Chapel Area Sch. Dist.*, 589 F. App'x 594, 598 (3d Cir. 2014)).

A

The IDEA requires states receiving federal education funding to provide a FAPE to all children with disabilities. 20 U.S.C. § 1412(a)(1). "A FAPE . . . includes both 'special education'"—instruction specially designed to meet the child's unique needs— and "related services"—"the support services required to assist a child to benefit from that instruction." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 390 (2017) (citations omitted) (cleaned up).

To meet its FAPE obligation, "a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.,* 580 U.S. at 399. The IEP must confer a meaningful benefit to the student and that benefit must be substantial. *T.M. on behalf of T.M. v. Quakertown Cmty. Sch. Dist.*, 251 F. Supp. 3d 792, 800 (E.D. Pa. 2017) (citations omitted). The Court will "give deference to the District where it offer[s] a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of the circumstances." *E.G. v. Great Valley Sch. Dist.*, No. 16-5456, 2017 WL 2260707, at *8 (E.D. Pa. May 23, 2017) (internal quotations omitted). Whether the District met its FAPE obligation is a question of fact. *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009).

B

The substantive requirements of Section 504 in the education context are largely, but not entirely, equivalent to the requirements under the IDEA. *See id.*; *James S. ex. rel. Thelma S. v. School Dist. of Phila.*, 559 F. Supp. 2d 600, 620 (E.D. Pa. 2008). To prove a violation of Section 504, a plaintiff must show a child is "disabled" under the Act, "otherwise qualified" to participate in school activities, the school district

10

receives federal financial assistance, and the child was excluded from participation in, denied the benefits of, or subject to discrimination at the school. *Andrew M. v. Delaware County Office of Mental Health and Mental Retardation*, 490 F.3d 337, 350 (3d Cir. 2007). The Third Circuit has noted that Section 504's "negative prohibition is similar to the IDEA's affirmative duty" such that a finding that a student received a FAPE under the IDEA "is equally dispositive" of a plaintiff's Section 504 claim. *D.K. v. Abington Sch. Dist.,* 696 F.3d 233, 253 n. 8 (3d Cir.2012) (internal quotation marks omitted). Additionally, the "substantive standards for determining liability under the Rehabilitation Act and the ADA are the same," *Ridley,* 680 F.3d at 282–83, such that a violation of Section 504 constitutes a violation of the ADA. *See James S*, 559 F. Supp at 622 (citing *Jeremy H. v. Mount Lebanon School Dist.*, 95 F.3d 272, 279 (3d Cir. 1996)).[1]

C

If a school district's IEP is inappropriate, and the student's parents obtain an appropriate private school program instead, the district must reimburse any tuition payments. 34 C.F.R. § 300.148(c); *School Comm. Of Burlington v. Dept. of Educ. Of Massachusetts*, 471 U.S. 359, 370–71 (1985). To determine whether tuition reimbursement is warranted, a court must first decide whether the district offered an appropriate program. If a court finds the district did not offer the student a FAPE, it then evaluates whether the parents' chosen program was appropriate, and whether there are equitable considerations that merit a reduction or elimination of a reimbursement award. *Id.*

---

[1] The parents also proceed under Chapters 14 and 15 of the Pennsylvania Code. Chapter 14 of the Pennsylvania Code adopts and implements the IDEA, while Chapter 15 implements Section 504 of the Rehabilitation Act. *See* 22 Pa. Code § 14.102(a); 22 Pa. Code § 15.1(a); *A.W. ex rel. H.W. v. Middletown Area Sch. Dist.*, No. 1:13-CV-2379, 2015 WL 390864, at *10–15 (M.D. Pa. Jan. 28, 2015) (finding Chapters 14 and 15 as coextensive with the IDEA and Section 504, respectively.)

III

The Hearing Officer correctly concluded that the parents are not entitled to tuition reimbursement because the District conducted an appropriate reevaluation in April of 2021 and offered Ruari a FAPE in May of 2021 that was reasonably calculated to enable him to make progress in light of his circumstances. Although the Hearing Officer acknowledged that "evidence supporting an Autism classification was weak when the 2021 RR was completed," such a conclusion is not entirely consistent with the record, given the results and interpretations of all the other testing and observations performed and conducted. (Hr'g Officer's Op. 19, ECF 5-3). In any event, the Hearing Officer found the evidence that resulted in a diagnosis of autism "was also the best information that the District could gather at the time." (Hr'g Officer's Op. 19, ECF 5-3).

A

i

The IDEA requires a school district to evaluate each child with a disability. 34 C.F.R. § 300.304(c)(6). The evaluation must consist of a procedure to "determine if the child is a child with a disability under the IDEA," and it must be "sufficiently comprehensive to identify all of the child's special education and related needs, whether or not commonly linked to the disability category in which the child has been classified." *Id.*; 300.301(c)(2); 300.304(c)(4).

The evaluation must include information from the child's parents, classroom assessments and observations, and reports by teachers and related services providers. 34 C.F.R. § 300.305(a)(1); 20 U.S.C. § 1414(c)(1)(A). Under the IDEA, the evaluation process shall:

1. Use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child, including information provided by the parent;

2. Not use any single measure or assessment as the sole criterion for determining whether a child is a child with a disability and for determining an appropriate educational program for the child; and

3. Use technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors.

34 C.F.R. § 300.304(b); 20 U.S.C.§ 1414(b)(2)(A).

ii

The parents disagree with the April 2021 Reevaluation Report's autism diagnosis, arguing the COVID-19 pandemic was no excuse to deviate from standard testing protocols. (Pls.' Br. Supp. Mot. J. Pleadings 14–17, ECF 12-1.) During the April 2021 administration of the ADOS-2, Ruari and the examiner wore masks, remained distanced, the testing materials were cleaned before and during the examination, and "a reduced number of materials were used, based on their ability to be easily disinfected." (Ex. S-2 at 20, ECF 5-8.) Because these modifications did not align with the assessment's standardized practices and would have impacted the observation of Ruari, the evaluator did not score the assessment, and cautioned that the ADOS-2 would only be used "in conjunction with the other assessment measures" to determine whether a diagnosis of autism was appropriate. (*Id.*)

To the extent there were any errors in the ADOS-2 evaluation, the Hearing Officer correctly found them to be procedural, and "[a] procedural violation is actionable under the IDEA only if it results in a loss of educational opportunity for the student, seriously deprives parents of their participation rights, or causes a deprivation of educational benefits." *D.S.*, 602 F.3d at 565 (citing *Winkelman v. Parma City Sch.*

13

*Dist.,* 550 U.S. 516, 525–26 (2007). The COVID-19 modifications to the ADOS-2 resulted in none of those substantive violations. Additionally, although the parents argue that Cohen's private ADOS-2 evaluation properly shows Ruari does not have autism, her evaluation was subject to a similar procedural modification—Cohen herself called it "non-standard"—with she and Ruari wearing masks during the evaluation. (Ex. S-5 at 38, ECF 5-8.)

Moreover, the District's autism diagnosis was multifactorial, and it demonstrated caution by only using the ADOS-2 for anecdotal purposes while relying on other assessments when reaching its autism diagnosis. Although Ruari's parents claim that "[t]he ADOS-2 was the only assessment that indicated the presence of autism," (Pls.' Br. Supp. Mot. J. Pleadings 14, ECF 12-1), the Reevaluation Report also incorporated input from Ruari's parents, his teachers, observations of Ruari, his prior diagnostic history of autism, as well as observations from the BASC-3, BRIEF-2 and the ASRS. The ASRS noted how "the teacher form indicated that Ruari has symptoms directly related to the DSM-5 diagnostic criteria, and is exhibiting many of the associated features characteristic of Autism Spectrum Disorder." (Ex. S-2 at 26, ECF 5-8.) Additionally, Dr. Smith testified that the autism diagnosis was also based on her "observations and [Ruari's] history." (Hr'g Tr. 5/20/22 at 107:21, ECF 5-7.) She discussed the behaviors Ruari exhibited during testing and in the classroom that were characteristic of autism and how he was previously given an autism classification in 2016 based on the ASRS, observations, and input from teachers. (*Id*. at 107:5–109:24.) Dr. Smith also testified that during her administration of the BASC-3 and the BRIEF-2 as part of her behavioral assessment, she noted "atypicality" and "withdrawal," and that these are characteristics of autism. (*Id*. at 110:14.) Given that the ADOS-2 was

14

only one component of the autism diagnosis, and its "anecdotal observations" were "used in conjunction with the other assessment measures," the Reevaluation Report was not flawed. (Ex. S-2 at 20, ECF 5-8)

## B

### i

The Court must next determine whether the District offered "an educational program reasonably calculated to enable the child to make progress appropriate in light of his circumstances." *Endrew F.*, 580 U.S. at 403. This standard is neither a hollow mandate nor "an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Id.* at 404. A court "may not rely on hindsight to second-guess an educational program that was reasonable at the time," so the analysis must turn on the information available to the District in April of 2021. *K.D. ex rel. Dunn v. Downingtown Area Sch. Dist.*, 904 F.3d 248, 255 (3d Cir. 2018); *see also Endrew F.*, 580 U.S. at 399. The focus must remain on whether the program the District offered was appropriate, not whether HGP's program was better. *See Endrew F.*, 580 U.S. at 399 ("[T]he question is whether the IEP is *reasonable*, not whether the court regards it as ideal." (emphasis in original)); *Ridley*, 680 F.3d at 278–79 (schools have discretion to select from various methods of meeting students' needs and have flexibility to balance disabled students' needs with financial and administrative concerns). Again, whether the District met its FAPE obligation is a question of fact. *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009).

Ruari's parents believe he was denied a FAPE because the District's educational programming proposed itinerant placement in the school's Autistic Support Classroom,

when they believe their son is not autistic.  (Pl.s' Br. Supp. Mot. J. Pleadings 18–20, ECF 12-1.)  Giving the Hearing Officer's factual findings due weight, his conclusion that the District's proposed IEP offered Ruari a FAPE was not erroneous.  As discussed above, it was reasonable for the district to classify Ruari with autism in April of 2021 and to implement a program to address that disability category and his underlying areas of weakness.  The May 2021 IEP reasonably addressed Ruari's primary disability category of autism and those specified areas of weakness (off-task behaviors, social skills and articulation).  The IEP offered placement in both the regular and special education classrooms to directly improve Ruari's performance in those areas.  (Ex. S-3 at 29, ECF 5-8.)  As it relates to the Autistic Support Classroom, the IEP noted how the "Special Education Classroom" would provide "[d]irect instruction in social skill (e.g., communication with peers during unstructured times, problem solving social situation, reciprocal communication)."  (*Id.*)  Ruari's placement in the Autistic Support Classroom was reasonably calculated to ensure Ruari made meaningful progress— specifically in light of his needs to develop greater social skills.

Notably, Cohen's report also recommended that Ruari receive specific support for deficiencies in social skills.  (Ex. S-5 at 40, ECF 5-8.)  She "strongly suggested" that Ruari take part in a "social skills group that meets weekly."  (*Id.*)  She also suggested that this "can occur at school or outside of school."  (*Id.*)  Although it does not impact the Court's analysis of the appropriateness of Ruari's programming, the program the District offered to develop Ruari's social skills is consistent with Cohen's recommendation.

ii

Ruari's parents also argue the Autistic Support Classroom is not the least restrictive environment, as the IDEA requires. (Pl.'s Br. Supp. Mot. J. Pleadings 18–20, ECF 12-1.) The IDEA contains a mainstreaming component that requires school districts to establish "procedures to assure that, to the maximum extent appropriate, handicapped children . . . are educated with children who are not handicapped." *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 578 (3d Cir. 2000). This requires districts to place disabled students in the least restrictive environment that will provide them with a meaningful educational benefit. *Id.* In *Oberti by Oberti v. Board of Education of Borough of Clementon School District*, 995 F.2d 1204, 1215 (3d Cir. 1993), the Third Circuit Court of Appeals established the test for determining whether a school district is in compliance with the mainstreaming requirement:

> First, the Court must determine "whether education in the regular classroom, with the use of supplementary aids and services, can be achieved satisfactorily." Factors the Court should consider in applying this prong are: (1) the steps the school district has taken to accommodate the child in a regular classroom; (2) the child's ability to receive an educational benefit from regular education; and (3) the effect the disabled child's presence has on the regular classroom. Second, if the Court finds that placement outside of a regular classroom is necessary for the child's educational benefit, it must evaluate "whether the school has mainstreamed the child to the maximum extent appropriate, i.e., whether the school has made efforts to include the child in school programs with nondisabled children whenever possible."

*T.R.*, 205 F.3d at 579 (quoting *Oberti*, 995 F.2d at 1215 (internal citations omitted). The Court must determine "whether the child can be satisfactorily educated in a regular classroom with supplemental services. If it finds that the child cannot be satisfactorily educated in that manner, the court must consider whether the school

attempted to mainstream the child to the maximum extent possible." *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 391 (3d Cir. 2006).

At the time the District proposed the May 2021 IEP, Ruari exhibited characteristics of Autism Spectrum Disorder, which called for placement in the Autism Support Classroom. Both the District and Cohen noted that Ruari exhibited a need for social skills instruction, which is "related to an eligibility category of autism." (Hr'g Tr. At 5/20/22 at 123:11–15, ECF 5-7.) The May 2021 IEP evidences that the District considered regular classroom education for the full day with the use of supplementary aids and services; however, the District rejected this option because "Ruari required direct, explicit instruction in social skills/functional needs, and delivery of such instruction in the regular classroom, in which no other students would be receiving similar instruction, would not enable Ruari to participate or make progress in the general curriculum or to interact with peers." (Ex. S-3 at 52, ECF 5-8.) The District also considered whether supplemental autistic support was sufficient to address Ruari's needs, but determined that in order to deliver "the direct, explicit instruction in social skills and functional needs that Ruari needs will require the displacement of more instructional time in the regular classroom and the general curriculum than could be accomplished with supplemental-level support." (*Id.*) The type of social skills programming Ruari required could not be delivered in the regular classroom.

As to whether the District sought to mainstream Ruari to the maximum extent possible, Ruari would have "participate[d] in the regular education and honors class for all academic/non-academic subjects" and would "be provided with a replacement curriculum for his study & organizational skills (autistic support). Ruari will receive two weekly individual speech services, 15 minutes per session." (Ex. S-3 at 34, ECF 5-

8.) Crucially, Ruari's special education support was labeled itinerant, and would never exceed twenty percent of the school day (Ex. S-3 at 35, ECF 5-8). The IEP made clear that Ruari would spend ninety percent of the school day in the regular education classroom. (*Id*. at 26). The Court is satisfied the District made every effort to maximize Ruari's education in the regular classroom and provided Ruari a FAPE.

V

Because the District offered Ruari a FAPE for the 2021–2022 school year, his parents are not entitled to tuition for his private education or attorneys' fees, and the Court need not address any further factors in the tuition reimbursement analysis. *See C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 70 (3d Cir. 2010) (finding reimbursement properly denied based on finding a district did not deprive student of a FAPE); 34 C.F.R. § 300.148(c).

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.